740 A.2d 1125 (1999)
326 N.J. Super. 209
In the MATTER OF TIDELAND'S LICENSE 96-0114-T.
Superior Court of New Jersey, Appellate Division.
Argued November 8, 1999.
Decided November 29, 1999.
*1126 Lewis Goldshore, Plainsboro, for appellant Paul Ahn (Goldshore & Wolf, attorneys; Mr. Goldshore and Mary S. Henifin, on the brief).
William E. Andersen, Deputy Attorney General, for respondent New Jersey, Department of Environmental Protection, Tidelands Resource Council (John J. Farmer, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Mr. Andersen, on the brief).
Joseph M. Clayton, Jr., Princeton, for respondents Betty J. Smuda, Hugh and Anne Boyle, Michael and Judith Stanton, Edward and John Truscio, David and Hazel Freeman, Dolores Hartkopf, E. Lynn Hunter, James and Merry Keller, and Michael Horowitz and Patricia Maloney.
Before Judges CONLEY, BRAITHWAITE and COBURN.
The opinion of the court was delivered by CONLEY, J.A.D.
This is an appeal from a seven-year revocable tidelands license, granted as of June 3, 1998, and dated November 9, 1998, by the New Jersey Tidelands Resource Council (Council) pursuant to N.J.S.A. 12:3-10, and approved by the Commissioner of the Department of Environmental Protection pursuant to N.J.S.A. 13:1B-13, and from the Council's January 6, 1999, denial of a stay and "reaffirmance" of the license. The license was issued to permit the "use and maintenance of a pier in Clay Pit Creek, out shore of a twenty-foot wide [riparian] right-of-way" located between two adjacent riparian properties, one of which is owned by appellant. We affirm.
The critical facts are these. In 1956, the then owners of certain land along Clay Pit Creek, a tributary of the Navesink River, filed a map plan with the Township of Middletown to develop their land into a fifteen lot subdivision, to be known as "Hartshorne Park." The plan provided *1127 for six riparian lots and nine inland lots. Between two of the riparian lots, lot 11 and lot 12 on the original subdivision plot, is a twenty-foot wide strip of land running from Clay Court, the street servicing the lots and on which the inland lots front, to the creek. This strip of land is not included in the deeds to either lot 11 or 12. Rather, when the nine inland lots were sold, seven of them contained language conveying the inland properties and:
a right-of-way in common with others to the party of the second part, their heirs and assigns over and across a strip of land twenty (20) feet in width running from Clay Court to Clay Pit Creek, a branch of the Navesink River, which strip of land lies between lots 11 and 12 on said map and is designated thereon as "Right-of-Way."
The deeds for the other two upland lots conveyed the properties:
Together with the right to use in common with others of property shown on said map, a certain right of way to the Navesink River located between lots 11 and 12 as shown on said map.
As far as the record reflects, none of the deeds for these inland lots from the original grantors retained in the grantors any reservation of rights or property interest in the twenty-foot strip of riparian land. Neither has the original grantor (nor, apparently, anyone else) ever been taxed separately for the property; it is not considered by the municipality to be a public street or public right of way. It seems, moreover, fairly evident that the subdivision was planned and approved with this strip of riparian property to provide the inland lot owners access to and use of the creek. Evidently consistent with this scheme, either simultaneous with or shortly after construction of the development, a dock was constructed offshore of the twenty-foot strip of riparian land which has been maintained and used over the years by the inland lot owners, at least until a storm in 1997 caused substantial damage.
This offshore use, of course, impinged upon the State's ownership interests in the adjacent tidelands, and, so, when the inland lot owners sought to rebuild the dock in the late 1990's, they were required to, and did, obtain a waterfront development permit pursuant to N.J.S.A. 12:5-3, not at issue here, and a tideland license from the Council. It is the Council's grant of this license that appellant challenges here and he does so primarily contending that the issuance of the license to the inland lot owners is beyond the authority of the Council as contrary to N.J.S.A. 12:3-10.
The State is the proprietor of all lands under tidewater below high water mark (tidelands) and possesses all of the incidents of ownership, including the absolute discretion in making conveyances or granting licenses to its tidelands, subject to the governing statutory criteria and the demands of the public trust doctrine. Atlantic City Elec. Co. v. Bardin, 145 N.J.Super. 438, 442-44, 368 A.2d 366 (App. Div.1976). See LeCompte v. State, 65 N.J. 447, 450-51, 323 A.2d 481 (1974); Taylor v. Sullivan, 119 N.J.Super. 426, 430, 292 A.2d 31 (App.Div.1972) ("action or inaction [of the Council] ... in respect of grants of its [tidelandes] interests is not reviewable in terms of alleged abuse of discretion but solely on the basis of whether [its] action is within or without the bounds of the pertinent statutory limitations."). The authority to exercise this discretion is reposed in the Council with the approval of the Commissioner of the Department of Environmental Protection, N.J.S.A. 13:1B-13. Its determinations are entitled to a presumption of validity. City of Newark v. Natural Resource Council in Dept. of Envtl. Protection, 82 N.J. 530, 539-40, 414 A.2d 1304, cert. denied, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980).
The pertinent statute is N.J.S.A. 12:3-10. It authorizes the Council to make grants, leases or licenses to:

Any riparian owner on tidewaters in this State who is desirous to obtain a lease, grant or conveyance from the *1128 State of New Jersey of any lands under water in front of his lands....[1]

[Emphasis added.]
Appellant's contention is that the inland lot owners here are not "riparian owners" within the meaning of the statute. To be sure, the discretion of the Council to grant licenses pursuant to N.J.S.A. 12:3-10 has been characterized as confined to an owner of the riparian or "upland" property. Ocean City Ass'n v. Shriver, 64 N.J.L. 550, 565, 46 A. 690 (E. & A.1900); Polhemus v. Bateman, 60 N.J.L. 163, 164-65, 37 A. 1015 (E. & A. 1897); Housing Auth. of Atlantic City v. State, 188 N.J.Super. 145, 149-50, 456 A.2d 534 (Ch.Div.1983), aff'd, 193 N.J.Super. 176, 472 A.2d 612 (1984). See Fitzgerald v. Faunce, 46 N.J.L. 536, 594 (E. & A. 1884). Moreover, it has consistently been held that the Council's discretionary authority to issue grants and licenses to riparian owners does not clothe it with the authority to adjudicate title disputes. Brown v. Morris Canal and Banking Co., 27 N.J.L. 648, 653-54 (E. & A. 1858); Bailey v. Driscoll, 34 N.J.Super. 228, 245, 112 A.2d 3 (App.Div.), aff'd in part, rev'd in part, 19 N.J. 363, 117 A.2d 265 (1955); Housing Auth. of Atlantic City v. State, supra, 188 N.J.Super. at 149, 456 A.2d 534.
It is, further, evident that in the particular factual setting here, the Council was concerned with the inland lot owners' status as to the twenty-foot strip of riparian property. Thus, when it initially approved the license at its June 3, 1998, meeting, it was with the understanding that the approval was subject to "authorization of upland [riparian] ownership." Following the Council's June 3, 1998, conditional approval, further information was submitted to the Council's staff with respect to the property rights of the inland lot owners. In response to this, the staff wrote to the inland owner's attorney:
DAG Andersen and I have reviewed your letter of July 15, 1998, as well as [appellant's] letters of August 17, 1998. We have also re-reviewed the deeds of the "inland" owners, as well as the filed map. DAG Andersen's conclusion is the "Clay Court Associates" property owners also own the 20 ft. strip which is called "Right of Way" on the filed map. Each deed contains a description of the individual lot, with a paragraph which starts "Together with a right of way in common with others...." No purpose for this right of way is given in the deeds, only that each owner has a common ownership with the others. [Appellant] contends that the purpose of this right of way was for an underground drainage system. We do not find any evidence of that stated purpose.

Therefore, upon payment of the fees requested in my August 20, 1998 letter, we will draft the license as approved by the Council on June 3, 1998. Because the "Clay Court Associates" does not seem to be a formal organization, we plan to issue the license to each individual homeowner by name and with a reference to their lot and block and deed book reference. The license will be issued to these persons "jointly severally," and that they are all liable under this license for its conditions and payment of the annual fees.

[Emphasis added.]
Additionally, in arguing before the Council on January 6, 1999, that it not grant appellant's application to either stay or revoke the license, counsel for the inland lot owners *1129 summarized the relevant ownership factors:
The [deeds conveying the inland lots] were probably not as artfully drafted as we might draft them today, but we submit what was intended is what today we would call a common element owned in common by the non-waterfront property owners to provide and facilitate their access to the Navasink River.
And when you look at the map, you see where the right-of-way is and you realize that a dock was built there at about the time this subdivision was created, maybe a little later, but it was late fifties, early sixties. I don't know if anyone pinned that down precisely, but clearly it was built about that time. And it's been, you know, there had been a dock there for some 30 plus years until it was it had deteriorated and then it was largely destroyed in a storm a couple or three years ago, and that's what precipitated the application to rebuild it.
But so you had the dock there, you had this right-of-way there, the deeds themselves make reference to access to the Navasink River, a right-of-way to the Navasink River together with the right to use in common with other owners a certain right-of-way to the Navasink River located between Lots 11 and 12 is shown on said map and so forth. It's pretty clear that what was intended by Killiam and McCue was that the nine non-waterfront owners have access to the river and the use of a pier, a dock that had been built there, so part of what one would acquire when he acquired one of those non-waterfront lots.
Killiam and McCue has shown absolutely no interest in this property since nobody heard from them, I guess, since 1961 or two. The property is not assessed for taxes to them. The municipality does not consider it a public street.... the nine non-waterfront owners own this property in common with each other and each of theirand their common ownership, rather, is really subject to an easement in each of them for access to the river.
Mr. Ahn has not, is not entitled, he is not an upland owner, he has no interest in the right-of-way, his property in the deed description in the chain of title call to the right-of-way and expressly mention it in the sense that they, you know, so many feet along the street to a right-of-way and so long a right-of-way distance and so forth, but he has no ownership interest in the right-of-way. So the question is, you know, "Who else could have an interest?" The answer is nobody else. It's either Killiam or McCue or it's the nine non-waterfront owners. Killiam and McCue have shown no interest. There is no grounds at all to find any intent on their part of retaining any interest in the property. They didn't reserve any rights in the deeds. There are no easement agreements. There simply is no basis to conclude that they would have any interest in this property today, if they were to show up and contest title.
Obviously, the Council accepted the position of the inland lot owners that their deeded rights to the twenty-foot strip of riparian property gave them sufficient indicia of riparian ownership such that they were entitled to apply for a riparian lease pursuant to N.J.S.A. 12:3-10. This conclusion is supported by the record before the Council. It is, moreover, not inconsistent with the evident purpose of the statute's riparian ownership requirement. These inland lot owners are not "strangers" seeking to purchase or use tidelands in front of appellant's riparian land. Cf. Keyport Steamboat Co. v. Farmers Transp. Co., 18 N.J. Eq. 511, 516 (E. & A. 1866). And the license they have been granted does not appear to interfere with any other riparian proprietor's "preemptive right" to tidelands. Compare Pamrapau Corp. v. City of Bayonne, 126 N.J. Eq. 479, 8 A.2d 835 (Ch.1939), aff'd, 127 N.J. Eq. 340, 12 A.2d 860 (E. & A.1940), aff'd, 129 N.J. Eq. 586, *1130 19 A.2d 877, aff'd, 130 N.J. Eq. 240, 21 A.2d 863 (E. & A.1941); Shamberg v. Board of Riparian Commr's, 72 N.J.L. 132, 135, 60 A. 43 (Sup.Ct.1905).
Moreover, to the extent there may be a title dispute over this small, evidently non-buildable piece of riparian property, that dispute would be between the inland lot owners and the original grantor, his heirs and assigns. That potential dispute was not resolved by the Council as its license plainly contains the provision that:
this license/lease is made upon the condition and limitation, that if the said licensees/lessees are not the record owners of any parts of the land adjacent to the land hereby licensed/leased ... then in that event, this license/lease and all of the covenants herein on the part of the State shall be void with respect to the land herein licensed/leased as to which the licensees/lessees are not the record owners ... and the licensed/leased land shall automatically revert to the ownership of the State....
See Housing Auth. of Atlantic City v. State, supra, 188 N.J.Super. at 149-50, 456 A.2d 534 ("[the Council's] limitation on the issuance of grants to only riparian owners was enforced not by an inquiry into the applicant's title, but by making the grant's validity contingent upon actual ownership.... " (citing Ocean City Ass'n v. Shriver, supra, 64 N.J.L. at 565, 46 A. 690, and Brown v. Morris Canal and Banking Co., supra, 27 N.J.L. at 652-53)).
In this respect, we take note of the January 7, 1999, declaratory judgment action filed by appellant seeking a determination that the property rights of the inland lot owners to the riparian strip is not a fee. We do not know the status of that proceeding and express no view as to the impact any determination therein might have upon the Council's license. We recognize that appellant has contended that the language in the respective deeds conveys an easement. We are, further, aware that an easement owner often is considered to hold a right in land different from a fee interest or even a leasehold interest, in that an easement has been characterized as "a `use' interest, but not a `possessory' one in the land." 7 Thompson on Real Property, § 60.02(c) (Thomas ed.1994). As such, an easement, as distinct from a fee, usually is referred to as a grant of a legal estate "to use in some way the land of another ... the grant of an easement is not a sale. The owner of the servient estate still owns the fee and has all the rights and benefits of ownership consistent with the enjoyment of the easement." Wellmore Builders, Inc. v. Wannier, 49 N.J.Super. 456, 465, 140 A.2d 422 (App.Div.), certif. granted, 27 N.J. 320, 142 A.2d 710 (1958). Thus, it has been said that "the easement holder has neither the permanent possession of even a single molecule of the land itself, nor the exclusive time-bounded possess granted by a lease." 7 Thompson on Real Property, supra, at § 60.02(c). A conveyance of a right-of-way, absent any other specific language, has similarly been viewed as distinct from an estate in fee. See generally Conveyance of "Right-of-Way," in Connection with Conveyance of Another Tract, as Passing Fee or Easement, 89 A.L.R.3d 767 (1979). And see Sergi v. Carew, 18 N.J.Super. 307, 311-12, 87 A.2d 56 (Ch. Div.1952) (even though habendum clause purported to convey a fee, when the granting clause granted lands "for a lane or way," an easement, and not an estate in fee was created). But see Fitzgerald v. Faunce, supra, 46 N.J.L. at 594-96 (a deed conveying certain upland property for "the sole right, privilege, use and enjoyment, at all times for all purposes of fishing ... and for no other purpose" conveyed an "actual estate," not "a mere easement" and, thus, grantee was a riparian owner entitled to a grant of riparian rights from the State.). Cf. Kline v. Bernardsville Ass'n, Inc., 267 N.J.Super. 473, 478, 631 A.2d 1263 (App. *1131 Div.1993) ("[w]here the easement comes into being by way of an agreement .... the `universally accepted principle' is that `the landowner may not, without the consent of the easement holder, unreasonably interfere with the latter's rights or change the character of the easement so as to make the use thereof significantly more difficult or burdensome.'" (Citations omitted.)).
Ultimately, however, it is the intent of the parties that is determinative of what has been conveyed by a deed, not the labels used. Normanoch Ass'n, Inc. v. Baldasanno, 40 N.J. 113, 125, 190 A.2d 852 (1963); United States Trust Co. v. State of New Jersey, 226 N.J.Super. 8, 12, 543 A.2d 457 (App.Div.1988); Hagaman v. Board of Ed. of Tp. of Woodbridge, 117 N.J.Super. 446, 451-52, 285 A.2d 63 (App.Div.1971). See Sergi v. Carew, supra, 18 N.J.Super. at 311, 87 A.2d 56 ("[t]he primary concern in attempting to ascertain whether the conveyance[ ] ... constitute[s] a conveyance in fee or merely create[s] an easement is to attempt to ascertain the intention of the parties. In order to ascertain that intention, the court must consider the situation as it was at the time of the execution of the conveyance.").
We need not grapple with these title considerations as we have determined that based upon what was before it, the Council properly concluded that the inland lot owners were endowed with sufficient indicia of riparian ownership such as to justify the exercise of its discretionary authority to issue the revocable license. We do note that, alternatively, the inland lot owners, as well as the Deputy Attorney General, have suggested that even were their property interest adjudicated as something less than a fee, the particular circumstances nonetheless would clothe that interest with sufficient property rights so as to qualify as riparian owners within the intent of N.J.S.A. 12:3-10. As to that, we express no view.
Finally, we briefly comment on appellant's contentions in point III of his brief as to lack of maintenance and vandalism. We do no more than to observe that the Council declined to consider appellant's attempts to raise this issue before it and find no abuse of discretion in that respect. We, further, note that the license expressly states that it is revocable "at the pleasure of" the Council, that the Council "may withdraw, terminate or revoke" the license at any time prior to its expiration, and that nothing in the license "shall in any manner affect the rights of any shore owner as now existing under the Laws of the State of New Jersey." If the licensees allow the use of the State's offshore property to become a nuisance and/or attract vandalism affecting another riparian owner's rights, it may be within the discretion of the Council to fashion an appropriate remedy upon application by such affected riparian owner. But such application was not the subject of the proceeding before the Council and is not, therefore, properly before us in this appeal.
Affirmed.
NOTES
[1] Pursuant to N.J.S.A. 12:3-23, the Council may also issue or grant a lease or conveyance to a non-riparian owner upon six months notice to the riparian owner and the failure of the owner to exercise his or her "preemptive" right to the tidelands. Since the inland lot owners have here consistently contended that their deeded interest in the twenty-foot wide riparian property constituted part of their bundle of ownership rights, they did not pursue the procedures under N.J.S.A. 12:3-23 available to non-riparian owners. See also N.J.S.A. 12:3-9 (applicable to tidelands of New York Bay, Hudson River and Kill von Kull).